1

                    UNITED STATES DISTRICT COURT
                             FOR THE
                       DISTRICT OF VERMONT


UNITED STATES OF AMERICA *
            V.           *    Case No:  2:16-cr-94-2
DONALD McFARLAN          *




                          SENTENCING
                        AUGUST 12, 2019
                      BURLINGTON, VERMONT



BEFORE:
     THE HONORABLE WILLIAM K. SESSIONS III
     District Judge

APPEARANCES:

     William B. Darrow, Esq., Assistant United States Attorney,
United States Attorney's Office, 11 Elmwood Avenue, P.O. Box
570, Burlington, VT  05402-0570; Attorney for the Plaintiff.

     Kevin M. Henry, Esq., Primmer Piper Eggleston & Cramer, 30
Main Street, Burlington, VT  05401; Attorney for the Defendant.



Court Reporter:  JoAnn Q. Carson, RMR, CRR




                  CAPITOL COURT REPORTERS, INC.
                         P.O. BOX 329
                BURLINGTON, VERMONT  05402-0329
                       (802/800) 863-6067
            E-MAIL:  Info@capitolcourtreporters.com

1   [Beginning at 10:30 a.m.]
2               THE COURT:  Good morning.
3               DEPUTY CLERK:  This is Case Number 16-94 United
4   States of America versus Donald McFarlan.  The Government is
5   present through Assistant United States Attorney William
6   Darrow.  The Defendant is present in the courtroom with his
7   attorney Kevin Henry.  The matter before the Court is
8   sentencing.
9               THE COURT: All right.  Mr. Henry, have you received
10  a copy of the presentence report?
11              MR. HENRY:  I have, Your Honor.
12              THE COURT:  And have you gone over that report with
13  Mr. McFarlan?
14              MR. HENRY:  Yes.
15              THE COURT:  Are there any factual errors in the
16  report?
17              MR. HENRY:  No, Your Honor.
18              THE COURT:  All right.  Mr. McFarlan, have you read
19  the report?
20              THE DEFENDANT:  Yes, Your Honor.
21              THE COURT:  Have you gone over the report with Mr.
22  Henry?
23              THE DEFENDANT:  Yes.
24              THE COURT:  Are there any factual mistakes in the
25  report?

1                THE DEFENDANT:  No.

2                THE COURT:  No.  Okay.  Mr. Darrow, any factual
3    errors?

4                MR. DARROW:  No.  Thank you.

5                THE COURT:  All right.  I've read the presentence
6    report, I've read the sentencing memoranda, attached letters
7    submitted by the Defendant.  There are no guideline application
8    issues.  The Government has submitted a report.  I've reviewed
9    that.  Defense has requested a non-guideline sentence.  In
10   light of that particular statement to the Court all of the
11   other issues are subsumed within the motion that has been
12   granted, and so let me turn to the Government and ask for your
13   recommendation.

14               MR. DARROW:  Thank you.  Your Honor, there are
15   aggravating and mitigating circumstances present as always, but
16   some of the ones in this case are, you know, we suspect that if
17   this defendant had not driven his cousin to Vermont in the
18   summer of 2015 he wouldn't be here today because one gets the
19   impression looking at his past at least 10 years, but probably
20   going back even further, 20, 25 years, that his intermittent
21   contact with the criminal justice system has been slight and
22   has involved lesser offenses.  I think they are all -- since
23   the age of 15 or 16 it's all marijuana and all accountable
24   convictions in the PSR marijuana.  It's generally -- one gets
25   the impression that he had the sort of misfortune of running

1  into someone he knew from early on in his life in the summer of
2  2015.  He was arrested in September 2016 and has been in
3  custody since then.  So he's got about three years credit.
4      Notwithstanding what he was doing, when he said yes to the
5  pitch that Folks gave him that summer was serious in nature
6  because not only does the PSR presentence report tally up a
7  significant amount of both heroin and crack cocaine that Mr.
8  McFarlan was bringing from New York up to folks in the
9  Burlington area, but he knew from spending time in the
10 Burlington area, you know, when he was parceling out the drugs
11 and getting paid for it before he headed back he had an
12 opportunity to see what was going on, and that was that whole
13 coterie of young women working for Folks were doing unfortunate
14 things in order to get drugs and Mr. McFarlan was working out
15 the drugs.  Notwithstanding that, the representations in the
16 defense memorandum we have no dispute with.  We think it was a
17 measured and forthright presentation and leaves, the Government
18 submits, the issue of sentencing to this Court's discretion.
19         THE COURT:  Mr. Henry.
20         MR. HENRY:  Your Honor, if I could, at first I would
21 like to introduce some folks that Mr. McFarlan is fortunate to
22 have in his life.  Ms. Della Santos is Mr. McFarlan's long time
23 girlfriend.  Ten years or so.  She stood by his side throughout
24 this ordeal, as well as Miss Della Santos's sister and her good
25 friend, and the gentleman in the room is Mr. McFarlan's

1  godfather Rolando (phonetic).
2              THE COURT:  Okay.  Welcome.
3              MR. HENRY:  And they are up here from New York, Your
4  Honor.
5              THE COURT:  Yes.
6              MR. HENRY:  So, you know, I want to be brief because
7  I do want to give Mr. McFarlan the chance to address the Court
8  directly because he wants to do that.  There is no question
9  that the conduct that resulted in Mr. McFarlan's conviction is
10 significant and harmful to the community, and I think one of
11 the things I tried to emphasize in the memorandum is Mr.
12 McFarlan's true regret and true sense of remorse of which I
13 believe is genuine and I believe comes from the perspective of
14 his understanding of the harm that these drugs do to the
15 community and particularly to the people that he saw in
16 connection with what was going on up here in Vermont.
17             THE COURT:  Well he certainly would have had personal
18 experience in, well, through his parents and the harm that
19 these drugs cause to people and to a community.
20             MR. HENRY:  There's no question about it, Your Honor,
21 and what -- you know what I was struck by throughout this
22 process is the true level of remorse that Mr. McFarlan feels
23 and the understanding from a very human nature of what he did
24 and how wrong it was, and I also would like to emphasize the
25 point that the Government made that this -- I think this is an

1	aberration in terms of involvement with these sorts of quote
2	unquote hard drugs, crack and heroin.  Mr. McFarlan has a long
3	history of marijuana, but no suggestion at all that he had ever
4	been involved in this sort of thing, and it really was a crime
5	of opportunity that, as I said in the memorandum, that Mr.
6	McFarlan took and he regrets taking not only for the harm it's
7	caused him.  He's been in prison here for three years almost,
8	been away from his family.  It -- certainly that has been hard
9	on him, but it's also been -- he's also reflected on the harm
10	he's caused to others.
11	     So those are the points I want to emphasize about the
12	offense conduct and his acceptance of responsibility, and the
13	other point I would like to make, Your Honor, is Mr. McFarlan
14	has an extraordinary level of support to go back to.  He's got
15	a wonderful relationship with Miss Della Santos, a stable place
16	to live, and he will be welcomed back into the communities or
17	the community he lived in which is reflected I think in some of
18	the letters that were submitted on his behalf, and so for all
19	of those reasons, as well as the reasons the Government
20	articulated, we think a time served sentence here of almost 3
21	years is sufficient but not more than necessary.
22	          THE COURT:  All right.  Do you wish to make a
23	statement, Mr. McFarlan?
24	          THE DEFENDANT:  Yeah.  I was going to write, you
25	know, write a letter to you and to the courts, but I decided

1  just to come from the heart pretty much, and first I want to
2  apologize to the courts, to Vermont, mainly my family for being
3  absent in their lives.  There's a lot of people that actually
4  missed me being not in their lives.
5              THE COURT:  Your two children, you maintained
6  closeness with them?
7              THE DEFENDANT:  Yes.
8              THE COURT:  How often do you talk with them?
9              THE DEFENDANT:  Every week or sometimes I miss a
10 week, but majority every week, or if I'm in a facility has that
11 video visits, I do a video visit with them.  I just recently
12 told my oldest daughter where I was and it broke me down, broke
13 her down.  It was terrible, but I had to eventually because she
14 thought that I wasn't -- I didn't want to be in her life
15 because she didn't know where I was really at.  So I had to
16 really break it down to her.
17             THE COURT:  And you found that to be very, very
18 difficult?
19             THE DEFENDANT:  One of the most difficult things in
20 my life.  The absence and her just not knowing it tore me down.
21 It really did.  What I'm here for I know -- I know I messed up,
22 Your Honor.  I definitely did.  I know that.  It's ironic that
23 I've been anti drugs all my life, but I was pressed against
24 money and I had an opportunity and I did, and I've been locked
25 up a long time and I see how the drugs takes down just not

1  blacks, whites, spanish, it takes down us as a human being.
2  It's sad cycle kids coming in and out, grown men coming in and
3  out I see.  I've been to a lot of facilities and I see a lot of
4  messed up things.  I don't want nothing to do with it man.
5  Nothing.  It's not even worth it, but you know what.  Mentally
6  I say to myself when I'm in my cell that I can't dwell on what
7  I have done and, you know, the things that I have done.  I
8  could just move forward and never put myself in a predicament
9  like that ever again because it's not just me.  It's my loved
10 ones.  My loved ones around me.  It was just --
11            THE COURT:  So are you going to get back into your
12 music or are you headed for a field in construction or what --
13 what's your intention?
14            THE DEFENDANT:  Actually I have to get a job
15 immediately so I'm going to do the construction, but I still
16 have my recording studio and I'm going to set my recording
17 studio up and I have an artist and I actually have a movie deal
18 that's on the table that's waiting for me.  A friend that
19 passed, me and his wife owns his name.  He's a famous -- he's a
20 famous DJ named Big Cap.  He passed away.  We did like a demo.
21 Got approval.  She's just waiting for me to get out.
22     I have a lot of opportunities when I get out actually, but
23 the construction -- I have to get a job immediately so I figure
24 I'm going to get the construction immediately, and then on the
25 side work -- work on, you know, music with my studio, and I

1  have an artist and everything and also I have -- I'm still a
2  dealer -- an used car dealer.  So I'm still assigned to
3  Manheim.  Manheim is one of the biggest auctions in the world.
4  I'm still going to purchase cars and sell cars on the side.  I
5  have to.  I have making up to do.  I have to support my kids,
6  man, and it can't be the way I'm in here for.  Never.  I can
7  promise you that.  I will never put myself in a predicament
8  like this ever again and I'm not just to you, Your Honor, I'm
9  promising that to me myself.  It's just not worth it.  It's
10 not, but I definitely have a lot of options and, like he said,
11 support when I get out.
12         THE COURT:  Well I am -- I've read the presentence
13 report.  I'm incredibly impressed with your level of commitment
14 to turn your life around and also the fact that you've
15 recognized that you made such a grievous mistake just because
16 of financial pressures that you had.  Just, you know, frankly
17 impressed with you as an individual and the plans that you have
18 in the future.  So is there anything else that you wish to say?
19         THE DEFENDANT:  Just apologizing to everyone that I
20 deserve to apologize to pretty much.  Thankful for my family
21 that's here for me.  You don't have to be blood to be a family.
22 None of these folks is my blood, but they are my family
23 forever.  That's pretty much it.
24         THE COURT:  Well again I've read the presentence
25 report.  I've read the sentencing memoranda.  I've observed

1  your testimony under tremendous stress.  You appeared to me to
2  be quite reflective on your life and the whole situation and
3  being quite honest in response to the mistakes that you made,
4  what you in fact did, and today your intentions for the future.
5      Sentencing in matters of extreme seriousness involves a
6  balancing of a lot of factors.  One balances society's views
7  about drugs and the danger that they create.  Clearly your
8  participation in the drug activity has been extraordinarily
9  serious.  You brought up a large quantity of drugs to be
10 distributed and also as a part of a much larger network in
11 which you saw young women sexually being abused because of
12 their addiction.  So it's extraordinarily serious, but again
13 you were honest and forthright.
14     I don't want this sentence to be confused that the Court
15 does not take seriously both the drug activity that you
16 participated in knowing full well that you also were
17 contributing in that respect to the treatment of these young
18 women.  I take that -- just take that extraordinarily serious.
19 It's not -- the sentence is not based upon the fact that I
20 don't -- that there were excuses for this kind of activity.
21 Essentially the sentence that the Court is going to impose is
22 due solely to the fact that you earned it, that you, you know,
23 are essentially a person who understands what mistakes they --
24 mistake you made, you have a support structure which is
25 incredibly well established that you earned as well, and that

1  now you do not pose a grave risk to the community, and in fact
2  assuming that you have follow through on the things that you
3  have intended to do, you have a lot to offer to the community.
4      So the Court grants the motion.  The Court departs to,
5  well, level 18 criminal history category 3.  Sentencing range
6  is 33 to 41 months and the Court finds as follows.  The offense
7  of conspiracy to distribute 28 grams or more of cocaine base
8  and 100 grams or more of heroin, in violation of 21 U.S.C.
9  Section 846, 841(b)(1)(B) occurred between in or about May of
10 2015 and March of 2016.  Guidelines apply.  The offense is
11 found in 2D1.1.  Offense involved at least 700 kilograms of
12 converted drug weight resulting in a base offense level of 28.
13 Specific offense characteristics apply.  Dangerous weapon was
14 possessed in connection with the offense.  2 level increase.  3
15 level reduction for acceptance of responsibility.  Total
16 offense level is 27.
17     Defendant's four criminal history points resulting in a
18 criminal history category of 3.  Sentencing range is 87 to 108
19 months prior to departure.  Guideline term of supervised
20 release is 4 to 5 years and probation is not eligible.  The
21 Government grants -- the Government -- the Court grants the
22 Government's motion for downward departure, departs to level
23 18, criminal history category 3, sentencing range of 33 to 41
24 months.
25     It is the sentence of the Court the defendant be committed

1    to the custody of the Federal Bureau of Prisons for time served
2    to be followed by a four-year term of supervised release.
3    Conditions of supervised release are as follows.  You must not
4    commit another federal, state, or local crime.  You must not
5    unlawfully possess a controlled substance.  You must refrain
6    from any unlawful use of a controlled substance.  You must
7    submit to one drug test within 15 days of release from
8    imprisonment or placement on probation and at least two
9    periodic drug tests thereafter as determined by the Court.  You
10   must cooperate in the collection of DNA as directed by the
11   probation officer.  You must comply with the standard
12   conditions of supervision set forth in Part G of the
13   presentence report.  These conditions are imposed because they
14   establish the basic expectations for your behavior while on
15   supervision and identify the minimum tools needed by probation
16   officers to keep informed, report to the Court about, and bring
17   about improvements in your conduct and condition.  You must
18   submit your person, property, house, residence, vehicle,
19   papers, computers, other electronic communications or data
20   storage devices or media or office to a search conducted by a
21   United States probation officer.  Failure to submit to a search
22   may be grounds for revocation of release.  You must warn any
23   other occupants that the premises may be subject to searches
24   pursuant to this condition.  An officer may conduct a search
25   pursuant to this condition only when reasonable suspicion

1   exists that you have violated a condition of supervision and
2   that the areas to be searched contained evidence of this
3   violation.  Any search must be conducted at a reasonable time
4   and in a reasonable manner.
5       You must participate in substance abuse treatment which
6   may include a substance abuse assessment with a licensed
7   substance abuse provider and abide by any programmatic
8   treatment recommendations.  This program may include testing to
9   determine whether you have reverted to the use of drugs or
10  alcohol.  You should contribute to the cost of services
11  rendered based on ability to pay or the availability of third
12  party payment, and you must refrain from the use of alcohol and
13  other intoxicants during and after treatment.
14      The guideline fine range is $25,000 to 5 million dollars.
15  The defendant has demonstrated an inability to pay a fine.  The
16  fine is waived.  Special assessment of $100 is imposed due
17  immediately.  Both the defendant and the Government may have
18  the right to appeal this sentence as set forth in Title 18 U.S.
19  Code Section 3742.  If the defendant is unable to pay the costs
20  of an appeal, he has the right to apply for leave to appeal in
21  forma pauperis and request the Court to appoint counsel for
22  him.  If the defendant so requests, the Clerk of Court shall
23  prepare and file forthwith a notice of appeal on behalf of the
24  defendant.  Notice by the defendant must be filed within 14
25  days of the day judgment is entered in the docket pursuant to

```
 1   Rule 4(b) of the Federal Rules of Appellate Procedure.  All
 2   right.  Is there anything further from the Government?
 3            MR. DARROW:  Couple bookkeeping matters, Your Honor.
 4   First, the Government moves to dismiss any remaining counts
 5   pending.
 6            THE COURT:  That motion is granted.
 7            MR. DARROW:  Thank you.
 8            THE COURT:  Mr. Henry.
 9            MR. HENRY:  Nothing further, Your Honor.
10            THE COURT:  All right.  Well, Mr. McFarlan, again
11   this is a balance.  This is truly a balance.  Essentially in my
12   view you earned your freedom, and I also, in light of the fact
13   that you have such a strong commitment to your two children,
14   would suggest to you I think, and in many ways as part of a
15   parent, you know, it's a privilege. Your kids -- you have one
16   who is fairly old and they have -- they are part of the
17   community.  They may very well feel the pressures of drugs and
18   may feel pressures to violate the law.  You have a rare
19   opportunity at this point to speak with them and I would urge
20   you to say this is what happened to you.  You made a major,
21   major mistake.  That mistake impacted a lot of people, a lot of
22   people in Vermont.  Perhaps in other places as well.  That
23   adults make mistakes and you made a really big one, but the
24   reason that you will be free is that you have had the
25   commitment and the desire to get back to your community, to get
```

1  back to them, and that you have earned it by fully accepting
2  responsibility for your conduct and doing something about it,
3  and if there's one lesson that can be given to young people at
4  vulnerable times of their life, it's just that.  Adults make
5  mistakes, they make big mistakes, but it's the courageous ones
6  who actually commit to their own rehabilitation and then come
7  out of it.  That, more than any other lesson, you can teach a
8  child is the most constructive.
9  [Adjourned at 11 a.m.]

                      C E R T I F I C A T I O N

14     I certify that the foregoing is a correct transcript
15  from the record of proceedings in the above-entitled matter.

                                         *JoAnn Q. Carson* (signature)

20  November 12, 2020                     _____
21  Date                                  JoAnn Q. Carson, RMR, CRR